1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
9                                    AT SEATTLE

10    MICHELLE J. KINNUCAN,                    CASE NO. C20-1309 MJP

11                      Plaintiff,             ORDER ON CROSS-MOTIONS
                                               FOR SUMMARY JUDGMENT
12         v.

13    NATIONAL SECURITY AGENCY;
      CENTRAL INTELLIGENCE
14    AGENCY; DEFENSE
      INTELLIGENCE AGENCY;
15    DEPARTMENT OF DEFENSE,

16                      Defendants.

17

18          This matter is before the Court on Plaintiff's motion for summary judgment, (Dkt. No.

19   20), and Defendants' cross-motion for summary judgment, (Dkt. No. 27).  Having considered the

20   motions and all supporting declarations, (Dkt. Nos. 20–22, 27–37), and the Parties' positions at

21   oral argument on December 16, 2021, the Court FINDS and ORDERS the following:

22          •   The House Appropriations Committee report Plaintiff requested via the Freedom of
                Information Act (FOIA) is not an "agency record."  The Court DENIES Plaintiff's
23              motion and GRANTS Defendants' motion on this issue.

24

- There is an insufficient factual record for the Court to determine whether the CIA and NSA have complied with FOIA in withholding and redacting records responsive to Plaintiff's FOIA request under exemptions (b)(1) and (b)(3). The Court ORDERS Defendants to submit all responsive records to the Court for <u>in camera</u> review so that the Court may determine whether records have been properly withheld. Defendants may retain their existing redactions under exemption (b)(6). The records shall be filed under seal within 14 days of this Order. Therefore, the Court RESERVES DECISION on this issue pending <u>in camera</u> review.

- Finally, the Court DENIES Plaintiff's motion on the issue of whether Plaintiff is entitled to declaratory relief.

## Background

Plaintiff Michelle Kinnucan is a researcher, writer, advocate, and veteran who is suing the National Security Agency (NSA), the Central Intelligence Agency (CIA), the Defense Intelligence Agency (DIA), and the Department of Defense (DOD) for violating her rights under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (2018).[1] Plaintiff seeks records relating to a 1967 attack by Israeli forces on a U.S. naval intelligence ship in international waters that left 34 dead and 173 wounded during the Six-Day War involving Israel, Egypt, Syria, Lebanon, and Iraq. (Dkt. No. 17 ("Amended Complaint") ¶¶ 1–5.)

### A.    House Appropriations Committee Report

One record Plaintiff has requested from the NSA is a report by staff of the House Appropriations Committee into communications errors that may have contributed to the U.S.S. Liberty failing to withdraw from its location ahead of the attack. (Dkt. No. 21, Declaration of Michelle Kinnucan, ¶ 6.) The report was never publicly released. But, in 2006, the NSA declassified a 1981 report that referred it and summarized its findings. (<u>See</u> Dkt. No. 28, Declaration of Jonathan David Hubbard, Ex. A at 4.) <u>See</u> William D. Gerhard and Henry W.

---

[1] The Parties have settled Plaintiff's claims against the DIA and any claim against DOD based on FOIA. Those claims have been dismissed. (Dkt. No. 26.)

1  Millington, <u>Attack on a Sigint Collector, the U.S.S. Liberty</u>, National Security Agency/Central

2  Security Service 59–60 (1981).[2]  Plaintiff contends the House report is of public interest in part

3  because it was one of only a few efforts by the federal government to investigate the incident,

4  which has never been satisfactorily explained.  (Dkt. No. 17, Amended Complaint ¶ 16–18.)

5          The NSA has a copy of the House report but has declined to release it on the ground that

6  it remains a congressional record and is not subject to FOIA.  (Hubbard Decl. ¶¶ 7–11.)  The

7  NSA received the report in May 1968.  (Dkt. No. 37, Declaration of Sara K. Stevens ¶ 10.)  The

8  report bears a "Top Secret" classification marking and is also stamped "Not for release unless

9  and until authorized by Committee."  (Hubbard Decl. ¶ 10; Stevens Decl. ¶ 11.)

10         **B.      Plaintiff's FOIA Requests**

11         On February 18, 2019, Plaintiff filed a FOIA request with the NSA seeking the House

12  report.  (Kinnucan Decl. ¶ 6 & Ex. 1.)  The NSA confirmed receipt on March 5, 2019 and asked

13  her to clarify the scope of her request.  (Hubbard Decl. ¶ 3.)  Plaintiff emailed the next day to

14  state that she sought both volumes of the House report.  (<u>Id.</u>, Ex. A.)  The NSA responded on

15  March 14, 2019 to acknowledge her request and assign a case number (106371).  (<u>Id.</u> ¶ 4 & Ex.

16  B.)  Plaintiff followed up over a dozen times without response.  (Kinnucan Decl. ¶ 6.)  She then

17  sued on September 1, 2020.  (Dkt. No. 1.)  The NSA sent a final response denying Plaintiff's

18  request on April 19, 2021.  (Hubbard Decl. ¶ 6 & Ex. D.)

19         Plaintiff also filed a second FOIA request to the NSA, on June 17, 2020, seeking

20  encrypted traffic reports and other documents.  (Kinnucan Dec. ¶ 7 & Ex. 2.)  The NSA

21  acknowledged receipt and assigned her a case number (109763) but did not otherwise respond

22

23  _____

[2] The report is available at https://www.nsa.gov/portals/75/documents/news-features/declassified-documents/uss-

24  liberty/chronology-events/attack-sigint.pdf.

1   until after suit.  (Id.)  The NSA denied her request on January 13, 2021, stating that it had not

2   found any responsive records.  (Id.)  Her appeal of March 4, 2021 was denied on June 2, 2021.

3   (Id. ¶¶ 10–11 & Exs. 5, 6.)

4       Plaintiff filed a third FOIA request, this time to the CIA, on May 31, 2020, for unredacted

5   reports involving the U.S.S. Liberty attack.  (Id. ¶ 8 & Ex. 3.)  CIA received the request on June

6   1, 2020 and sent an acknowledgment letter dated June 3, 2020 and received June 5, 2020,

7   assigning her a case number (F-2020-01511).  (Dkt. No. 30, Declaration of Vanna Blaine ¶¶ 7–8

8   & Ex B.)  Plaintiff received responses to her initial request to the CIA on March 26 and May 5,

9   2021, which included redacted documents.  (Kinnucan Decl. ¶¶ 13–15 & Exs. 8–10.)

10       Plaintiff and the CIA dispute the scope of her request.  Plaintiff states that she sent an

11   amended request on June 17, 2020 in which she made three additional requests.  (Kinnucan Decl.

12   ¶ 8 & Ex. 3.[3])  The CIA denies ever receiving the amended request and states it was unable to

13   locate it in any of its records.  (Blaine Decl. ¶ 9.)  However, the CIA admits receiving another

14   request from Plaintiff on December 10, 2020 which was identical to the one she sent on June 17,

15   2020.  (Id. ¶ 10 & Ex. C.)  Because the amended complaint does not mention the December 10,

16   2020 request, the CIA contends that the additional records requested are not part of this lawsuit.

17   Nevertheless, it sent her a final response to that request on May 18, 2021.  (Blaine Decl. ¶ 13.)

18       Plaintiff filed suit on September 1, 2020.  (Dkt. No. 1.)  She filed an amended complaint

19   on July 16, 2021.  (Dkt. No. 17.)  After settling some of Plaintiff's claims, the Parties agreed on a

20   briefing schedule to resolve outstanding issues and filed the instant motions.

21

22

23

24

[3] Also available at https://www.muckrock.com/foi/united-states-of-america-10/uss-liberty-a-memo-thirteen-reports-a-letter-93923/.

1                                             **Discussion**

2       The Parties have cross-moved for summary judgment on three issues.  First, whether the

3 House report in the possession of the NSA is an agency record subject to FOIA.  Second,

4 whether the CIA and NSA are permitted to withhold responsive records under certain FOIA

5 exemptions.  And, third, whether Plaintiff is entitled to declaratory relief that Defendants

6 violated FOIA by failing to promptly respond to her requests.

7       Summary judgment is appropriate if the moving party "shows there is no genuine dispute

8 as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

9 56(a).  A fact is "material" if it would affect the outcome of the case under the relevant

10 substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute over a

11 material fact is "genuine" "if the evidence is such that a reasonable jury could return the verdict

12 for the nonmoving party."  Id.  The Court draws any inferences from the facts in the light most

13 favorable to the nonmoving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475

14 U.S. 574, 587 (1986).

15       FOIA requires federal agencies to "promptly" release records upon request by any

16 person, so long as the request reasonably describes the records and complies with published rules

17 and procedures.  5 U.S.C. § 552(a)(3)(A) & (4)(B).  The Act provides nine enumerated grounds

18 for exempting records from disclosure.  Id. § 552(b)(1)–(9).  The primary goal of the Act is to

19 promote disclosure, which Congress viewed as a predicate for democratic accountability.  Am.

20 Civ. Liberties Union of N. Cal. v. U.S. Dep't of Just., 880 F.3d 473, 482–83 (9th Cir. 2018).

21       Judicial review of agency decisions on requests for information under FOIA is de novo.

22 5 U.S.C. § 552(a)(4)(B); Animal Legal Def. Fund v. U.S. Food & Drug Admin., 836 F.3d 987,

23 990 (9th Cir. 2016) (en banc).  The agency has the burden of showing that its action complies

24

1  with the Act.  Id.; U.S. Dep't of Just. v. Tax Analysts, 492 U.S. 136, 143 n.3 (1989) ("The

2  burden is on the agency to demonstrate, not the requester to disprove, that the materials sought

3  are not 'agency records' or have not been 'improperly' 'withheld.' ")  The Court may review

4  withheld records in camera to determine whether they fall within any of the exemptions.

5  5 U.S.C. § 552(a)(4)(B); e.g., Am. Civ. Liberties Union of N. Cal., 880 F.3d at 485.  As for

6  relief, the Court "has jurisdiction to enjoin the agency from withholding agency records and to

7  order the production of any agency records improperly withheld from the complainant."  Id.

8  **I.    Whether the House Report Is an Agency Record Subject to FOIA**

9          While this is a close question on this record, the Court finds that there are no genuine

10  disputes over material facts and concludes the House report is not an "agency record."  As a

11  result, Defendants have no obligation to disclose it under FOIA.

12          **A.    Congressional Records in Possession of an Agency**

13          FOIA requires the disclosure of "agency records."  The Act defines records, in relevant

14  part, as "any information that would be an agency record subject to the requirements of this

15  section when maintained by an agency in any format."  5 U.S.C. § 552(f)(2).  Congressional

16  records are exempt.  See Am. Civ. Liberties Union v. CIA, 823 F.3d 655, 662 (D.C. Cir. 2016),

17  cert. denied, 137 S. Ct. 1837 (2017).  However, as is the case here, agencies often come into

18  possession of congressional records.  See id. at 663.  Because the Act does not clearly define

19  "agency records," see id. at 662, courts have looked at different factors to determine whether a

20  congressional record in the possession of an agency has become an "agency record" subject to

21  FOIA.

22          Any record an agency (1) creates or obtains and (2) controls at the time the FOIA request

23  is made is an "agency record."  Rojas v. Fed. Aviation Admin., 941 F.3d 392, 407 (9th Cir.

24  2019) (citing U.S. Dep't of Just. v. Tax Analysts, 492 U.S. 136, 144–45 (1989)).  Both elements

1   must be met for a record to be subject to FOIA.  The first element is met here because it is

2   undisputed that the NSA has a copy of the report.  (Hubbard Decl. ¶ 10.)

3        With respect to the second element—control—the Supreme Court has made two

4   principles clear.  First, the mere fact that a document is physically located at an agency does not

5   make it an "agency record."  Tax Analysts, 492 U.S. at 145; Kissinger v. Reps. Comm. for

6   Freedom of the Press, 445 U.S. 136, 157 (1980) ("We simply decline to hold that the physical

7   location of the [documents] renders them "agency records").  Second, there must be some

8   connection between the official duties of the agency and the fact that the agency has possession

9   of the records for the agency to have "control."  "By control we mean that the materials have

10  come into the agency's possession in the legitimate conduct of its official duties."  Id.

11       However, neither the Supreme Court nor the Ninth Circuit has established a standard to

12  address the constitutional considerations at play when an agency is in possession of a

13  congressional record.  In particular, the Constitution recognizes Congress's oversight role and

14  authority to keep certain records secret: "Each House shall keep a Journal of its Proceedings, and

15  from time to time publish the same, excepting such Parts as may in their Judgment require

16  Secrecy."  U.S. Const. Art. I, § 5, cl. 3.

17       The D.C. Circuit has developed such a framework.  See Am. Civ. Liberties Union v. CIA,

18  823 F.3d 655, 662–63 (D.C. Cir. 2016).  To determine whether a document that was created by

19  Congress and is physically possessed by an agency, the D.C. Circuit focuses on two inquiries: (1)

20  the facts and circumstances of the documents' creation and (2) the conditions attached to the

21  documents' transfer to the agency.  Id. at 661–664.  Because neither the Supreme Court nor the

22  Ninth Circuit has articulated a test that addresses the constitutional considerations for

23  congressional records, and because the Parties have not proposed an alternative, the Court finds

24

the D.C. Circuit's approach persuasive and adopts it here as consistent with the Ninth Circuit's

guidance to take a fact-driven approach to determining whether an agency controls a particular

record such that it is subject to FOIA.  See Rojas v. Fed. Aviation Admin., 941 F.3d 392, 409

(9th Cir. 2019).

**B.      Congressional Intent to Control the House Report**

Applying the D.C. Circuit's framework, the facts and circumstances of the House report's

creation demonstrate that Congress intended to maintain control over the report as a

congressional record even after giving a copy to the NSA.  In particular, the record shows that

Congress restricted the NSA's use of the report by marking it "Not for release unless and until

authorized by Committee."  There is no genuine dispute over this fact and the inescapable

conclusion is that the report was never under agency control.

*1.      Facts and circumstances of the report's creation.*

The two-volume report was created by staff of the House Appropriations Committee in

1967 following a hearing on communications errors in the attack on the U.S.S. Liberty.  Gerhard

& Millington, supra, at 59.  There appears to be no public record of that hearing, as the Parties

have not identified any and the Court could not find one.  The report examined the effectiveness

of the Department of Defense communications system.  Id. at 59–60.  The report is marked "Top

Secret" and "Not for release unless and until authorized by Committee."  (Hubbard Decl. ¶ 10.)

The NSA received the report in May 1968 and has no copy without those markings.  (Stevens

Decl. ¶¶ 10–11.)

The facts and circumstances of the creation of the House report are more like the those

relating to a congressional hearing transcript in Goland v. CIA, 607 F.2d 339 (D.C. Cir. 1978),

held to be a congressional record, than congressionally created records in Paisley v. CIA, 712

1    F.2d 686 (D.C. Cir. 1983), opinion vacated in part, 724 F.2d 201 (D.C. Cir. 1984), held to be

2    agency records.  In Goland, the D.C. Circuit held that a transcript of a congressional hearing on

3    the CIA's organic statutes was a congressional record even though the CIA possessed a copy.

4    Congress held the hearing in executive session, the stenographer was sworn to secrecy, the

5    transcript was marked "Secret," and the transcript contained "discussions of basic elements of

6    intelligence methodology, both of this country and of friendly foreign governments, as well as

7    detailed discussions of the CIA's structure and disposition of function." Id. at 347.  In addition,

8    the CIA had retained the transcript solely for internal purposes, effectively holding it as a

9    "trustee" for Congress.  Id.  These facts established Congress's intent to maintain control over

10   the transcript.  In contrast, in Paisley, the D.C. Circuit found several records created by Congress

11   and transferred to the CIA and FBI were agency records.  The Court noted that Congress

12   "affixed no external indicia of control or confidentiality on the faces of the documents." 712

13   F.2d at 694.  The Court found this significant because Congress had marked other related records

14   as confidential—which the district court had properly found to be exempt as congressional

15   records.  Id.

16        Here, the Committee clearly indicated its intent to control the report by marking it "Not

17   for release unless and until authorized by Committee" and "Top Secret," just as the transcript in

18   Goland was marked "Secret" and the records in Paisley were unmarked.  In addition, the

19   substance of the report concerned sensitive national security issues—defense communications

20   systems and naval intelligence practices—akin to those at issue in Goland.  Finally, the

21   Committee's decisions to create the report and provide it to the NSA were squarely in line with

22   Congress's oversight role.  In the year after the attack, the Committee held a hearing in which it

23   discussed the report and defense communication systems more broadly in the context of

24

1    proposed appropriations.  <u>Department of Defense Appropriations for 1969: Hearings Before a</u>

2    <u>Subcommittee</u> of the H. Comm. on Appropriations, 90th Cong. 357–58 (Apr. 8, 1968) (statement

3    of Rep. Sikes, Member, H. Comm. on Appropriations) ("A general conclusion could be drawn

4    from the staff reports that the use and operational capabilities of the Department of Defense

5    Communications System is nothing less than pathetic, and the management of the system needs

6    to be completely overhauled"); <u>see generally id.</u> at 357–99.  <u>Compare Am. Civ. Liberties Union</u>

7    <u>v. CIA</u>, 823 F.3d 655, 659 (D.C. Cir. 2016) (Senate Committee report on CIA program was part

8    of Congress's oversight role); <u>Goland v. CIA</u>, 607 F.2d 339, 346 (D.C. Cir. 1978) (emphasizing

9    Congress's oversight role).  Plaintiff's contention that the NSA's mere possession indicates

10   Congress "released" the report is not supported by the case law.  <u>See Am. Civ. Liberties Union</u>,

11   823 F.3d at 662; <u>U.S. Dep't of Just. v. Tax Analysts</u>, 492 U.S. 136, 145 (1989).

12     While Plaintiff argues that Congress's reference to the report in open hearings cuts

13   against the conclusion that it intended to keep the report secret, that does not necessarily follow.

14   If Congress wanted the report to be public, it could have released it in full.  It did not and instead

15   made sure the report would not be disclosed.

16     Plaintiff also disputes that the report remains "Top Secret."  (Dkt. No. 31 at 5–6 n.3.)

17   The Court does not find this dispute to be genuine or one concerning a material fact.  Plaintiff

18   points out that the bibliography of the 1981 NSA report contains a "~~TS~~" marking next to the

19   House report.  <u>See</u> Gerhard & Millington, <u>supra</u>, at 67.  But this is not a genuine dispute because

20   Plaintiff cites no authority the Court can rely on to conclude, on the basis of that notation alone,

21   that the report has been declassified.  On the other side, Defendants have provided two sworn

22   declarations to the contrary, stating unequivocally that the report remains classified.  (Hubbard

23   Decl. ¶ 10; Stevens Decl. ¶ 11.)  In addition, the NSA has no "record indicating that NSA, or

24

1   anyone else, added these markings after NSA received the document in 1968." (Stevens Decl.

2   ¶ 11.)  Even if the dispute were genuine, whether the report remains "Top Secret" is not material

3   here because the other facts and circumstances—the marking that the report cannot be released

4   without Committee approval, the connection to Congress's oversight role, and the substance of

5   the report—are sufficient to establish the report as a congressional record.

6                    2.      *Conditions attending the report's transfer to the NSA.*

7           Defendants have also shown that Congress imposed restrictions on the NSA's use of the

8   report.  It is undisputed that the report is marked "Not for release unless and until authorized by

9   Committee."  Although the report's findings have been summarized or referred to in publicly

10  available records, the report itself has never been made public.  And the NSA has no record of

11  the report without that marking.  (Stevens Decl. ¶ 11.)  The NSA's statements that the

12  Committee declined to authorize the report's release when the NSA contacted it in 2008 and

13  2020, (Hubbard Decl. ¶¶ 12–13), are not considered because they are viewed as post-hoc

14  objections to disclosure.  Am. Civ. Liberties Union v. CIA, 823 F.3d 655, 664 (D.C. Cir. 2016).

15          The "not for release" marking is an unequivocal expression of Congress's intent to

16  maintain control over the report.  Similarly, in Am. Civ. Liberties Union v. CIA, the D.C. Circuit

17  held that a Senate Select Committee on Intelligence report on the CIA's detention and

18  interrogation programs was a congressional record exempt from FOIA.  The "critical evidence"

19  was a 2009 letter from the Senate Committee Chairman and Vice Chairman to the Director of the

20  CIA which made clear that the Committee intended to control its work product, including the

21  report, "emanating from its oversight investigation of the CIA." Id. at 665.  The letter included

22  the following statement:

23              Any documents generated on the network drive referenced in paragraph 5, as well
                as any other notes, documents, draft and final recommendations, reports or other

24

1

2

3

4

5

6

> materials generated by Committee staff or Members, are the property of the
> Committee and will be kept at the Reading Room solely for secure safekeeping
> and ease of reference. These documents remain congressional records in their
> entirety and disposition and control over these records, even after the completion
> of the Committee's review, lies exclusively with the Committee. As such, these
> records are not CIA records under the Freedom of Information Act or any other
> law. . . . If the CIA receives any request or demand for access to these records
> from outside the CIA under the Freedom of Information Act or any other
> authority, the CIA will immediately notify the Committee and will respond to the
> request or demand based upon the understanding that these are congressional, not
> CIA, records.

7

8

9

Id.  The D.C. Circuit found this letter marked Congress's intent to maintain control over the final

report the plaintiffs sought.  Id. at 665–66.  While there is no similar letter here, the marking is

specific to the report at issue and could not be more plain.

10

**II.      Whether the CIA Improperly Withheld Information under FOIA**

11

12

13

14

15

16

17

18

There are nine grounds for exempting a record from disclosure under FOIA.  5 U.S.C.

§ 552(b)(1)–(9).  These exemptions reflect the recognition that legitimate governmental and

private interests could be harmed by the release of certain types of information.  Am. Civ.

Liberties Union of N. Cal. v. U.S. Dep't of Just., 880 F.3d 473, 483 (9th Cir. 2018).  The

exemptions are narrowly construed and Defendants have the burden of justifying withholding

under any of them.  Id.  The Court may review withheld records in camera to determine if the

agency applied the exemptions appropriately.  5 U.S.C. § 552(a)(4)(B); e.g., Am. Civ. Liberties

Union of N. Cal., 880 F.3d at 485.

19

20

21

22

23

24

Even if a record falls within an exemption, the agency must segregate any portion that

does not and disclose it to the requester.  Any "reasonably segregable portion of a record shall be

provided to any person requesting such record after deletion of the portions which are exempt."

5 U.S.C. § 552(b).  An agency must support its determination that records are exempt with

affidavits, which "must describe the justifications for nondisclosure with reasonably specific

detail, demonstrate that the information withheld logically falls within the claimed exemptions,

1   and show that the justifications are not controverted by contrary evidence in the record or by

2   evidence of [agency] bad faith." Id. at 769.  The Court reviews an agency's supporting

3   declarations and Vaughn index, if included, de novo.  Id.[4]

4        In its Vaughn index and supporting declaration, the CIA claims responsive documents are

5   exempt under FOIA exemptions (b)(1) (classified information), (b)(3) (information exempt

6   under other statutes), and (b)(6) (personnel files and personal privacy).  (Blaine Decl., Ex. H.)

7   On this record, the Court does not have a sufficient factual basis to determine that the CIA and

8   NSA have applied the exemptions appropriately.  Therefore, the Court ORDERS Defendants

9   CIA and NSA to file under seal all responsive records that have been withheld or redacted for in

10  camera review within 14 days of this Order.

11  **A.      Exemption 552(b)(1) for Classified Information**

12       The CIA claims certain records are exempt under Section 552(b)(1) to protect "classified

13  intelligence methods and sources."  (See Blaine Decl., Ex. H; Kiyosaki Decl. ¶¶ 31–37.)  An

14  agency does not have to disclose information that is

15       (1)(A) specifically authorized under criteria established by an Executive order to
        be kept secret in the interest of national defense or foreign policy and (B) are in
16       fact properly classified pursuant to such Executive order.

17  5 U.S.C. § 552(b)(1).

18       The issue here is whether the information withheld remains "in fact properly classified."

19  See 5 U.S.C. § 552(b)(1)(B).  The Declaration of Vanna Blaine, an information review officer at

20  the CIA, describes what the documents are generally and provides additional explanation beyond

21

22  [4] "A 'Vaughn index' is a document supplied by government agencies to opposing parties and the court [in FOIA litigation] that identifies each document withheld, the statutory exemption claimed, and a particularized explanation of how disclosure of the particular document would damage the interest protected by the claimed exemption, and the index is designed to provide reasoning against which the requester can offer effective advocacy and a basis for the court to reach a reasoned decision." Id. at 769 n.4 (internal quotation marks omitted); see also Vaughn v. Rosen,

23

24  484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974).

1    what is included in the <u>Vaughn</u> index.  (<u>See</u> Blaine Decl., ¶¶ 20–35.)  Ms. Blaine states that the

2    withheld records are properly classified under Executive Order 13526 because disclosure may

3    result in damage to national security.  (<u>Id</u>. ¶ 37.)

4          For classification to be proper under EO 13526, two elements are required: (1) disclosure

5    must reasonably be expected to result in damage to national security and (2) "the original

6    classification authority is able to identify or describe the damage."  There are three levels of

7    classification:

8          (1) "Top Secret" shall be applied to information, the unauthorized disclosure of
          which reasonably could be expected to cause exceptionally grave damage to the

9          national security that the original classification authority is able to identify or
          describe.

10
          (2) "Secret" shall be applied to information, the unauthorized disclosure of which

11          reasonably could be expected to cause serious damage to the national security that
          the original classification authority is able to identify or describe.

12
          (3) "Confidential" shall be applied to information, the unauthorized disclosure of

13          which reasonably could be expected to cause damage to the national security that
          the original classification authority is able to identify or describe.

14    Exec. Order 13526 § 1.2(a).

15          Ms. Blaine claims "disclosure of these details—which would reveal the sources and

16    methods by which CIA acquired intelligence—could reasonably be expected to cause damage to

17    [] national security by impairing the CIA's ability to carry out its core missions of gathering and

18    analyzing foreign intelligence and counter-intelligence and conducting intelligence operations."

19    (Blaine Decl. ¶ 38.)  Mr. Kiyosaki goes further and claims that the vast majority of the

20    information is classified as top secret.  (Kiyosaki Decl. ¶ 36.)  Ms. Blaine acknowledges the

21    records are old but contends that disclosure of even small details about the CIA's capabilities and

22    sources at the time could be helpful to adversaries today and that many intelligence sources and

23    methods remain viable for years to come.  (Blaine Decl. ¶ 41.)  The problem with the CIA's

24

1   explanation is that it could be used for any classified information dealing with intelligence

2   methods or sources.  Compare Electronic Frontier Foundation v. U.S. Dep't of Just., 376 F.

3   Supp. 3d 1023, 1034–35 (N.D. Cal. 2019).  This presents a challenge to judicial review because

4   there must be an adequate factual basis to conclude the CIA properly withheld the records or

5   portions of them.  See Hamdan v. U.S. Dep't of Just., 797 F.3d 759, 769 (9th Cir. 2015).

6           One example illustrates how the CIA's explanation limits proper judicial review.

7   Document 8 (C03030912) allegedly contains "top secret" classified information, which means

8   disclosure would be expected to cause exceptionally grave damage to national security.  The

9   document is an intelligence bulletin that is almost entirely redacted.  (See Kunnican Decl., Ex. 10

10  at 44.)  The portions that are not redacted are news summaries of current events from around the

11  world which do not appear to contain anything revealing.  It may be that this document is

12  currently classified but it is difficult to determine whether it remains "in fact properly classified"

13  without more context or detail.

14          In addition, of the fifteen responsive documents, the CIA released twelve in part and

15  denied three in full (documents 11–13).  Two of the three documents withheld in full are large:

16  Document 11 is 94 pages and Document 12 is 70 pages.  (Blaine Decl. Ex. H.)  These records are

17  identified as internal documents and very well could include information that remains sensitive,

18  such as the location of previous CIA facilities.  But, without more, it is difficult to determine

19  whether these documents remain properly classified in full.  Because the records are old—

20  thirteen date to 1967, two to 1978—it is not self-evident that they implicate intelligence methods

21  and sources that continue to deserve classification.  In addition, the Court cannot just accept the

22  CIA's assertion that it is impossible to segregate exempt from nonexempt records.  Hamdan, 797

23  at 778.

24

In sum, at least as to classified information under exemption (b)(1), the CIA's explanation falls short of "demonstrate[ing] that the information withheld logically falls within the claimed exemptions." Id. at 769. It leaves the Court without an adequate factual basis to conclude that these records fall within the identified exemption because it is impossible to evaluate the legitimacy of the CIA's claims.

**B.      Exemption 552(b)(3) for Information Exempt under Other Statutes**

The CIA also claims many of the documents are exempt from disclosure under other statutes. (Blaine Decl. ¶¶ 46–47; Kiyosaki Decl. ¶¶ 38–42.) Under this exemption, an agency is not required to disclose records that are

> (3) specifically exempted from disclosure by statute (other than section 552b of this title), if that statute--
>
> (A)      (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or
>
>          (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and
>
> (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

5 U.S.C. § 552(b).

The CIA has identified Section 102(A)(i)(1) of the National Security Act, 50 U.S.C. § 3024, and Section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C. § 3507, as statutory bases for this exemption. (Blaine Decl. ¶ 47.) The National Security Act provides that the Director of National Intelligence (DNI) "shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024. The DNI is authorized to protect CIA methods. The CIA's position is that Exemption (b)(3) applies coextensively to all the information that is subject to Exemption (b)(1) because the information would reveal specific intelligence sources and methods.

1    As with exemption (b)(1), it is difficult to review the CIA's broad claims.  For example,

2    the CIA states it has withheld codewords and pseudonyms from the records, including

3    "throughout" documents 11–13 (the records totaling 173 pages that are completely withheld).

4    (Blaine Decl. ¶¶ 50–52.)  But those records are simply too large to consist entirely of codewords

5    and pseudonyms.  Similarly, the CIA has withheld classification and dissemination control

6    markings, which could tip adversaries about the sensitivity of various records.  (Blaine Decl.

7    ¶¶ 53–55.)  But classification and dissemination markings could be redacted without having to

8    redact other responsive portions.  Finally, the CIA claims it has withheld titles, names,

9    identification numbers, and organizational information of CIA personnel, including contractors

10   under Section 6 of the CIA Act.  (Blaine Decl. ¶¶ 56–57.)  These redactions appear to be more

11   limited—although the CIA claims that Document 13 has been withheld entirely on this basis.  In

12   short, it is difficult to find a sufficient factual basis to uphold the CIA's response.  See Hamdan

13   v. U.S. Dep't of Just., 797 F.3d 759, 769 (9th Cir. 2015).  Defendants have also not carried their

14   burden on exemption (b)(3) and must submit the records for in camera review.

15       **C.       Exemption 552(b)(6) for Personal Privacy**

16       Finally, the CIA has withheld portions of records under Section 552(b)(6), which

17   exempts "personnel and medical files and similar files the disclosure of which would constitute a

18   clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  The CIA construes

19   "similar files" to include "any personally identifying information of covert or overt CIA

20   personnel and other individuals mentioned in the documents, such as names, positions, contact

21   information, social security numbers, unique Agency identifiers (such as pseudonyms and

22   Agency identification numbers), and similar identifying details."  (Blaine Decl. ¶ 58.)  The CIA

23

24

states it has applied exemption (b)(6) to withhold exempt information regarding CIA personnel, the release of which

> could subject them to intimidation, harassment, embarrassment, or unwanted contact by virtue of their association with the CIA. For the same reason, publicly disclosing information about any CIA officer would be reasonably likely to cause foreseeable harm to that individual, whose privacy interests this exemption is meant to protect.

(Id. ¶ 60.) The CIA has applied the exemption to Document 1 at pages 1 and 3 and Document 15 at page 3. (Id.) Both documents are from 1978. It appears that the CIA has applied this exemption to redact several names. (See Kinnucan Decl., Ex. 10 at 3, 5, 92.)

The Court has some hesitation about accepting at face value the need to redact names from documents that are so old, without some explanation as to the current need. But Plaintiff has not articulated any public-interest rationale for requiring the disclosure of these names. Because the CIA's application of this exemption is minimal and essentially unchallenged, the CIA may keep these (b)(6) redactions when it submits its records for in camera review.

**III.     Whether Plaintiff Is Entitled to a Declaration that Defendants Violated FOIA by Failing to Promptly Respond or Produce Records**

Plaintiff moves for a declaration that Defendants have violated FOIA. FOIA requires federal agencies to "promptly" disclose agency records upon request. 5 U.S.C. § 552(a)(3)(A). In addition, the agency must "notify the person making such request of [its] determination and the reasons therefor." Id. § 552(a)(6)(A)(i)(I). The deadline for the agency's initial determination is not the same as its actual production, and FOIA acknowledges some requests may take a significant amount of time. The standard for production is that the agency must make the records "promptly available," "which depending on the circumstances typically would mean within days or a few weeks of a 'determination,' not months or years." Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n, 711 F.3d 180, 188 (D.C. Cir. 2013).

1    Declaratory relief may be available for claims in which a plaintiff alleges that an agency

2 policy or practice will impair their access to information in the future.  The plaintiff must show:

3    (1) the agency's FOIA violation was not merely an isolated incident, (2) the
        plaintiff was personally harmed by the alleged policy, and (3) the plaintiff himself
4        has a sufficient likelihood of future harm by the policy or practice.

5 Animal Legal Def. Fund v. U.S. Dep't of Agric., 933 F.3d 1088, 1092 (9th Cir. 2019) (internal

6 quotation marks and citations omitted).  Declaratory relief is generally not available for cases

7 such as this one, where the plaintiff seeks the production of a particular record that has allegedly

8 been improperly withheld because actual production moots the claim.  Id.

9    While Plaintiff's claim is not yet moot, because the Court has reserved decision on the

10 records Defendants have produced, she has not alleged a pattern or practice of violations.  In

11 particular, she has not alleged that she has a sufficient likelihood of future harm by Defendants'

12 policy or practice.  Therefore, the Court finds declaratory relief inappropriate and DENIES

13 Plaintiff's motion on this issue.

14    The clerk is ordered to provide copies of this order to all counsel.

15    Dated December 28, 2021.

16

17    Marsha J. Pechman
        United States Senior District Judge

18

19

20

21

22

23

24