# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

MICHELLE KINNUCAN      *

     *Plaintiff,*      *

v.      *      Civil Action No.: 2:20-cv-01309

     *

NATIONAL SECURITY AGENCY,      *
CENTRAL INTELLIGENCE AGENCY,      *
THE DEFENSE INTELLIGENCE      *
AGENCY, AND THE      *

DEPARTMENT OF DEFENSE      *

     *Defendants.*      *

---

## DECLARATION OF ADAM DeMILLIO

I, ADAM DeMILLIO, hereby declare and state:

1.     I am the Deputy Chief of Enterprise Guidance Services ("EGS") at the National Security Agency ("NSA" or "Agency"). I have been in this position since 2023, and I have been employed with NSA since 2007. In my current role, I am responsible for leading and coordinating the efforts of a team of engagement and policy professionals across multiple offices, including providing oversight of NSA's Freedom of Information Act Office ("NSA FOIA Office"). This office has primary responsibility for responding to requests for NSA records made pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act of 1974 ("PA"), 5 U.S.C. § 552a.

2.     I have held a range of significant leadership positions throughout the Agency within the Operations, Cybersecurity, and Engagement & Policy Directorates, and I have a detailed understanding of NSA's operations, management processes, and resources. Immediately prior to

assuming my current position, I served as the Deputy Chief and Acting Chief of an NSA operations organization. My other experience includes serving in leadership roles overseeing policy and strategy while managing interactions with partner agencies, completing multiple details in mission-related operations, and serving in various other intelligence leadership positions.

3.      Through the exercise of my official duties, I have become familiar with the current litigation which arose out of FOIA request 106371, made by Michelle Kinnucan for "both volumes I and II of A Report to the Committee on Appropriations – U.S. House of Representatives of the Effectiveness of the Worldwide Communications Systems and Networks of the DoD, U.S.S. Liberty Incident." The purpose of this declaration is to explain the basis of NSA's June 28, 2024 determination following the re-processing of FOIA request 106371 that volumes I and II of A Report to the Committee on Appropriations – U.S. House of Representatives of the Effectiveness of the Worldwide Communications Systems and Networks of the DoD, U.S.S. Liberty Incident ("HAC report") is a congressional record not subject to processing under FOIA. A copy of NSA's determination letter to Kinnucan, along with a follow up letter, is attached as Exhibit A.

## I.      NSA'S ORIGIN AND MISSIONS

4.      The NSA was established by Presidential Directive in October 1952 as a separately-organized agency within the Department of Defense ("DoD") under the direction, authority, and control of the Secretary of Defense. NSA has two primary missions: (1) to collect, process, analyze, produce, and disseminate SIGINT information for foreign intelligence and counterintelligence purposes to provide support for national and departmental requirements and for the conduct of military operations; and (2) to conduct information assurance/cybersecurity activities.

5.      NSA has developed a sophisticated worldwide SIGINT collection network that acquires foreign signals. In performing its SIGINT mission, NSA exploits foreign signals to obtain

intelligence information necessary to the national defense, national security, and/or the conduct of foreign affairs. The technological infrastructure that supports NSA's SIGINT collection network has taken years to develop at a cost of billions of dollars and significant human effort. It relies on sophisticated collection and processing technologies designed to keep pace with challenging new technological developments.

## II.   <u>IMPORTANCE TO THE NATIONAL SECURITY</u>

6.       There are two primary reasons for gathering and analyzing intelligence information. The first, and most important, is to gain the information required to direct U.S. resources as necessary for the national security of the United States. SIGINT information provided by NSA is routinely distributed to a wide variety of senior Government officials, including the President, the President's National Security Advisor, the Director of National Intelligence, the Secretaries of Defense, State, Treasury, and Commerce, U.S. ambassadors serving in posts abroad, the Joint Chiefs of Staff, and the Unified and Specified Commanders. In addition, SIGINT information is disseminated to numerous agencies and departments including, among others, the Central Intelligence Agency ("CIA"), the Federal Bureau of Investigation ("FBI"), the Drug Enforcement Administration ("DEA"), the Departments of the Army, Navy, and Air Force, and various intelligence components within DoD. Information provided by NSA in a classified setting to the military and other government agencies and officials within the Intelligence Community ("IC") is relevant to a wide range of important issues including, but not limited to, military order of battle, threat warnings and readiness, arms proliferation, terrorism, and foreign aspects of international narcotics trafficking. This sensitive information is often critical to the conduct of U.S. foreign policy and of U.S. military operations around the world. Moreover, intelligence produced by NSA is often unobtainable by other means.

7.    NSA's ability to produce SIGINT depends on its access to foreign signals. Further, SIGINT capabilities are both expensive and fragile. Public disclosure of either the capability to collect specific signals or the substance of the SIGINT information itself can easily alert foreign adversaries to the vulnerability of their signals.

8.    The subset of SIGINT information obtained from intercepted foreign communications is called communications intelligence ("COMINT"). A fundamental tenet of the COMINT process is that the identity of specific communicants whose communications are intercepted (commonly referred to as "targets"), the degree of success in exploiting these targets, and the vulnerability of particular foreign communications are all matters that must be maintained in strictest secrecy because the ability to exploit foreign communications is fragile. Disclosure of the identity of the targets, the ability to exploit those targets, or the vulnerability of particular foreign communications would encourage counter measures by the targets of NSA's COMINT efforts. Disclosure of even a single intercepted communication holds the potential to reveal the intelligence collection techniques that are applied against targets around the world. Once alerted, COMINT targets may change the way they communicate, which could inhibit access to the targets' communications and, therefore, deny the United States access to information crucial to the defense of the United States both at home and abroad. If a target is successful in defeating an intercept operation, all of the intelligence from that source is lost unless and until NSA can establish new and equivalent exploitation of that target's signals. If a source becomes unavailable, the military, national policymakers, combatant commanders, and the IC must operate without the information the communications provided. Such losses are extremely harmful to the national security of the United States.

9.      Congress has specifically recognized the inherent sensitivity of NSA's and the larger IC's intelligence activities; thus, Congress has passed statutes to protect the IC's intelligence activities as well as NSA's SIGINT efforts from damage by disclosure. These statutes recognize the vulnerability of intelligence and, specifically, SIGINT to countermeasures of a foreign power or terrorist party and the significance of the loss of valuable foreign intelligence information to national policymakers, combatant commanders, and the IC. For example, under Section 6 of the National Security Act of 1959 (codified at 50 U.S.C. § 3605) and 18 U.S.C. § 798, NSA is authorized to protect certain information concerning its activities and its intelligence sources and methods from public disclosure. Additionally, Section 102A(i)(l) of the Intelligence Reform and Terrorism Prevention Act of 2004 (codified at 50 U.S.C. § 3024) authorized the IC to protect from disclosure its sensitive intelligence sources and methods.

10.     Congress also conducts oversight of NSA's activities, as well as the activities of other intelligence agencies. For example, in its oversight role, Congress authorizes funds for use in intelligence or intelligence-related activities.

11.     Thus, NSA has certain information sharing obligations to Congress, and in turn, Congress may, inter alia, issue public or private reports in connection with NSA or other IC activities. For example, Intelligence Community Directive 112 establishes IC policy to provide written notification to the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence (collectively the "Congressional intelligence committees") in order to keep them fully and currently informed of intelligence activities. Additionally, 50 U.S.C. §3091 mandates that "[t]he President shall ensure that the congressional intelligence committees are kept fully and currently informed of the intelligence activities of the United States, including any significant anticipated intelligence activity as required by this subchapter."

12.     NSA understands that Congress has the authority to keep certain information secret and within congressional control. Generally, however, NSA does not assume that every document in NSA possession that originated with Congress remains a congressional record subject to congressional control unless Congress manifested a clear intent to control it.

### III.    KINNUCAN'S FOIA REQUEST 106371 AND PRIOR PROCEEDINGS

13.     Kinnucan submitted a FOIA request to NSA on February 18, 2019, which Kinnucan amended by email on March 6, 2019, to seek "both volumes I and II of 'A Report to the Committee on Appropriations- U.S. House of Representatives on the Effectiveness of the Worldwide Communications Systems and Networks of the DoD, U.S.S. Liberty Incident." A true and correct copy of Kinnucan's email is attached as Exhibit B to my declaration.

14.     NSA responded by letter dated March 14, 2019. This letter informed Kinnucan that her request would be assigned case number 106371 and acknowledged that NSA's FOIA office received her request. The letter also notified Kinnucan that NSA's search had been completed but that responsive material identified would require further review. A true and correct copy of this document is attached as Exhibit C to my declaration.

15.     On September 21, 2020, NSA received a copy of Kinnucan's initial Complaint in this litigation, filed in the United States District Court for the Western District of Washington. *See* Dkt. 1. On April 19, 2021, NSA sent a letter further responding to FOIA request 106371 and setting forth the Agency's determination that the requested records (i.e., both volumes of the HAC report) were not agency records subject to FOIA, but rather were records created and controlled by the U.S. House of Representatives. Because the Agency was not authorized to process the records under FOIA, Kinnucan's request was therefore denied. A true and correct copy of this document is attached as Exhibit D to my declaration.

16.     Kinnucan subsequently filed an Amended Complaint in July 2021 challenging, inter alia, NSA's determination that the HAC report was a congressional record not subject to FOIA. *See* Dkts. 17-18. In support of its position that the HAC report is a congressional record, NSA submitted two declarations on October 1, 2021, and one declaration on October 29, 2021.

17.     The Court granted NSA summary judgment on this issue, ruling that the HAC report was not an agency record under FOIA. *See* Dkt. 40. At the conclusion of further summary judgment proceedings, Kinnucan appealed the Court's ruling.

18.     During the appeal, NSA moved for a voluntary remand. As indicated in the motion for remand, government counsel discovered additional information in NSA's possession that was potentially responsive to Kinnucan's FOIA request or otherwise could bear on the question of congressional intent to control the HAC report, including an NSA internal routing slip and memorandum, handwritten notes on the HAC report, and information concerning the "TOP SECRET" marking. In light of the information and NSA's obligations under FOIA, NSA sought a remand in order to re-process FOIA request 106371 and provide Kinnucan and the District Court an opportunity to consider the additional information.

## IV.     <u>REPROCESSING FOLLOWING REMAND</u>

19.     Following remand, on June 28, 2024, NSA completed its re-processing of FOIA request 106371. *See* Exhibit A. To re-process, NSA began with the FOIA request itself and again determined that it solely sought the HAC report and no additional records.

20.     NSA then considered the additional information identified during the course of appeal in analyzing whether the HAC report was a congressional record. NSA made discretionary releases of the additional information that it determined may bear on questions of congressional control and NSA's possession of the HAC report.

21.     NSA also conducted additional searches for the purpose of determining whether any additional NSA records could be located that would shed light on the question of Congress' intent to maintain control of the HAC report. No additional records were found beyond those identified through NSA's response.

## V.     THE HAC REPORT IS A CONGRESSIONAL REPORT NOT SUBJECT TO PROCESSING UNDER THE FOIA

22.     NSA continues to conclude that the HAC report is a congressional record, and not an agency record, and is therefore not subject to FOIA processing. Kinnucan specifically identifies two volumes of a Congressional report ("A Report to the Committee on Appropriations - U.S. House of Representatives on the Effectiveness of the Worldwide Communications Systems and Networks of the DoD, U.S.S. Liberty Incident"). NSA understands the request on its face to seek records that were prepared by the staff of the Committee on Appropriations of the U.S. House of Representatives, and for which the congressional committee has indicated a clear intent to maintain control over release. The information reviewed during the re-processing of the FOIA request does not demonstrate otherwise or change NSA's ultimate determination.

23.     Based upon my review of the HAC report, I can confirm that it indicates that it was prepared by the staff of the Committee on Appropriations of the U.S. House of Representatives (also known as the House Appropriations Committee or HAC). NSA understands that when Congress creates a document, and a copy comes into the possession of federal agency, the document does not become an agency record subject to disclosure under the FOIA if Congress has shown a clear intent to control the document. Congress has exempted itself, and its records, from FOIA. Therefore, the fact that a government agency may have a copy of a congressional document does not, by itself, subject that document to the FOIA.

24.     NSA determined that Congress clearly expressed its intent to maintain control over the HAC report because the report contains a banner stating "NOT FOR RELEASE UNLESS AND UNTIL AUTHORIZED BY COMMITTEE." I have reviewed the report and note that the banner is contained twice in each volume; on the cover page of each volume, and on a memorandum page that follows the cover page in each volume of the report.  These memorandum pages are titled "Memorandum For the Chairman" and are signed "Respectfully Submitted" by the "Director" for the "Survey and Investigations House Appropriations Committee." These memorandums are dated December 29, 1967 and February 15, 1968.   I have not seen any record indicating that NSA, or anyone else, added the banner stating "NOT FOR RELEASE UNLESS AND UNTIL AUTHORIZED BY COMMITTEE" after NSA received the document in 1968.Rather, based on my experience and to the best of my knowledge based on the information available to me, it is my understanding that the banner would have been included by the staff of the Committee on Appropriations of the U.S. House of Representatives as the preparer of the report.  It is also my experience and based upon my knowledge that this banner is used by Congress to indicate its intent to retain control. Without facts to show that Congress relinquished this control, NSA is not permitted to release this report.

25.     NSA's conclusion that Congress did not relinquish control is further supported by additional inquiries to Congress. As previously indicated in the declarations by Jonathan Hubbard (Dkt 28, para 12-13) and Sara Stevens (Dkt 37, para 7), Kinnucan's FOIA request was not the first time that this report has been requested. On March 17, 2008, NSA received a request for the same report.  It is my understanding that given the historical interest in the report and the amount of time that had passed since the report was authored, the Agency's Legislative Affairs Office ("LSLA") contacted the HAC to determine whether the report could be released. On October 1, 2009, LSLA received a phone call from a staff member of the HAC who informed the Agency that the

report could not be released.  This statement affirmed the original instruction from the HAC that the report was not to be released, and that Congress continued to exercise control over the report. As a result, the 2008 FOIA request for the HAC report was denied.

26.     As a courtesy to Kinnucan, NSA's LSLA office reached out to the HAC in July 2024 advising that this case is on remand and they were again seeking the committee's "position on releasing these documents."  LSLA's email concluded by asking for "thoughts on which HAC subcommittee this falls under, the determination, and any concerns [the committee] may have."  In response, a committee staff member responded via email saying, in full, "I think the subject matter of the report would continue to fall under the HAC-D jurisdiction.  To my knowledge there is no change in the Committee's policy regarding this matter, but let me know if you need anything additional to that effect."  I am aware that "HAC-D" refers to the defense subcommittee of the HAC.

27.     LSLA's office staff members also re-confirmed that they were not aware of any records that indicated that Congress previously relinquished control of the HAC report and/or authorized NSA to release the report, and a new search of the email accounts of the individuals who would reasonably have received such correspondence produced no relevant records.

### VI.  Discretionary Releases

28.     In NSA's 28 June letter, NSA also identified and disclosed additional information that NSA reviewed for responsiveness and also considered in reaching its conclusion.

29.     While NSA considered and released the information identified below to Kinnucan in order to provide a full and complete record, consideration of this information did not change NSA's ultimate position. The key for NSA's determination is the banner stating "NOT FOR RELEASE

UNLESS AND UNTIL AUTHORIZED BY COMMITTEE," and the information described below does not undermine this indication of Congress' intent to maintain control.  I understand that the additional information was not presented earlier because it was not initially identified as potentially responsive to the FOIA request and therefore not processed under FOIA, and/or because the potential significance of the information was not appreciated until further review.

30.     NSA released to Kinnucan a "Routing and Transmittal Slip" and a "Memorandum for the Director/Deputy Director" of NSA, a copy of which is included with Exhibit A. The routing slip and memorandum are internal NSA records. NSA determined that these 2 pages are not responsive to Kinnucan's FOIA request because the request sought one specific record which contained two volumes (i.e., the HAC report). But NSA nonetheless released these two internal documents because they reference NSA's possession of the requested HAC report and therefore potentially had bearing on the decision of whether the report was a congressional record.

31.     During NSA's re-processing, NSA also reviewed handwritten notes contained on the HAC report and determined that these notes are not responsive to Kinnucan's FOIA request. However, NSA disclosed the content of those notes that may bear on the question of whether the HAC report is a congressional record and/or or may reflect NSA's views on that question.

32.     In handwritten print across the cover pages of both Volumes I and II a note says "Not releasable" and "Information appeared in the press on 8 July '68."[1] There is no indication of who wrote the cover page notes stating that the volumes are "not releasable." However, based upon my review of the notes throughout the report, I can infer that they were applied by NSA.

---

[1] The June 28 letter to Plaintiff inadvertently stated "June".

33.     The other notes throughout the body of the report are not responsive to the FOIA request nor does NSA interpret them to provide any information relating to Congress' intent. Therefore, NSA determined that a discretionary release was not warranted of every handwritten note.

34.     NSA re-confirmed that every page of the HAC report is marked "TOP SECRET." In addition, NSA indicated that a memorandum page that is included in both volumes contains a statement that "This report is classified TOP SECRET because it contains information, so classified by the Department of Defense, relating to matters involving national security of the United States." NSA has consistently treated the HAC report as a Top Secret classified document, including limiting its disclosure and employing other protections. But, whether the HAC report should be considered currently and appropriately classified Top Secret is a distinct inquiry from whether the HAC report is a congressional record. Given the quoted language, NSA clarifies that NSA does not rely on the Top Secret marking as an indicator of congressional intent to maintain control of the HAC report, but rather as a communication about the type of information contained in the HAC report and classification.

35.     While the "TOP SECRET" stamp, however, may not directly indicate Congress' intent to retain control of a document, it is not inconsistent with the congressional intent indicated by the banner stating "NOT FOR RELEASE UNLESS AND UNTIL AUTHORIZED BY COMMITTEE."

## VII.   CONCLUSION

36.     The facts described above support the Agency's understanding that Congress clearly expressed its intent to retain control over the document at the time of its creation and has not relinquished that control. NSA has considered not only the request on its face, but all additional

information and that information did not refute the initial conclusion. Therefore, NSA is not

permitted to process the report for release under FOIA absent Congressional authorization. To date,

NSA continues to treat the HAC report as a congressional record that it is not free to release.

37.     I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of August, 2024, pursuant to 28 U.S.C. § 1746.

ADAM DeMILLIO
Deputy Chief of
Enterprise Guidance Services
National Security Agency