UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICHELLE J. KINNUCAN,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL SECURITY AGENCY; CENTRAL INTELLIGENCE AGENCY; DEFENSE INTELLIGENCE AGENCY; and DEPARTMENT OF DEFENSE,<br><br>Defendants. | CASE NO. C20-1309 MJP<br><br>ORDER ON FOURTH CROSS-MOTIONS FOR SUMMARY JUDGMENT |

This matter comes before the Court on the Parties' Fourth round of Cross-Motions for Summary Judgment. (Dkt. Nos. 85, 88.) Having reviewed the Motions, Responses (Dkt. Nos. 88 90, Replies (Dkt. Nos. 90, 91), and all supporting materials, and having held oral argument on November 15, 2024, the Court GRANTS Defendants' Motion and DENIES Plaintiff's Motion.

**BACKGROUND**

Plaintiff Michelle Kinnucan is a researcher, writer, advocate, and veteran who is suing the National Security Agency (NSA) among other agencies for allegedly violating her rights under the Freedom Of Information Act, 5 U.S.C. § 552 (FOIA). Kinnucan issued a FOIA request seeking records relating to a 1967 attack by Israeli forces on a U.S. naval intelligence ship, the U.S.S. Liberty, in international waters that left 34 dead and 173 wounded during the Six-Day War involving Israel, Egypt, Syria, Lebanon, and Iraq. (Amended Complaint ¶¶ 1–5 (Dkt. No. 17).) As is now relevant, Kinnucan demanded "both volumes I and II of 'a Report to the Committee on Appropriations-US. House of Representatives on the Effectiveness of the Worldwide Communications Systems and Networks of the DoD, U.S.S. Liberty Incident.'" (Ex. B to the Declaration of Adam DeMillio (Dkt. No. 86-2).) The Court refers to the House Appropriation Committee's two volume report as the "HAC Report," and it is the sole focus of the issues before the Court.

This is not the first time Kinnucan's demand for the release of the HAC Report has been before the Court. As part of its Order on the Parties' first Cross-Motions for Summary Judgment, the Court determined that NSA properly withheld the HAC Report as a congressional record that falls outside of FOIA's disclosure rules. (See Order on Motions for Cross-Summary Judgment (Dkt. No. 40).) Kinnucan then appealed that Order. While on appeal, NSA "discovered additional information in NSAs possession that was potentially responsive to Kinnucan's FOIA request or otherwise could bear on the question of congressional intent to the control the HAC Report[,]" and the Parties stipulated to remand. (Declaration of Adam DeMillio ¶ 18 (Dkt. No. 86).) NSA has now disclosed the additional records, but continues to withhold the HAC Report. Before the Court are cross-motions for summary judgment as to whether NSA continues to

1 | properly withholding the HAC Report. The Court reviews the history of the HAC Report, NSA's

2 | possession of it, and newly-released information regarding NSA's possession.

3 | **A.    The HAC Report's Creation**

4 | In 1967, during a "special hearing," the House Appropriations Committee "directed its

5 | Surveys and Investigations staff to examine the effectiveness of the DoD worldwide

6 | communications system." (DeMillio Decl. Ex. B (Dkt. No. 86-2 at 8); see Department of

7 | Defense Appropriations for 1969: Hearings Before a Subcommittee of the H. Comm. on

8 | Appropriations, 90th Cong. 357-58, 393-99 (Apr. 8, 1968) (the "1968 Hearing").)[1] The HAC

9 | "staff studied the delays and nondelivery of messages originated on 7 and 8 June directing the

10 | withdrawal of the Liberty as a springboard to its broader review of DoD's worldwide

11 | communications" and "staff produced a two-volume report for the chairman of the congressional

12 | committee"—the HAC Report. (DeMillio Decl. Ex. B (Dkt. No. 86-2 at 8).) The HAC Report

13 | "reviewed the communications problems in the Liberty incident" and "the worldwide

14 | communications systems and networks of the DoD." (Id.)

15 | To NSA's knowledge, the HAC Report has never been made public by Congress or

16 | anyone else. (DeMillio Decl. ¶¶ 25-27.) Kinnucan became aware of the HAC Report after NSA

17 | partially declassified a 1981 NSA report entitled "Attack on a Sigint Collector, the U.S.S.

18 | Liberty," which noted that NSA's copy of the Congressional report is "located in the 'Crisis

19 | Collection' of the NSA History Collection." (DeMillio Decl. Ex B.) The Parties and Court refer

20 | to this 1981 report as "Attack." The Attack report includes summaries of the some of the details

21 | of the HAC Report, and noted that the "[s]ource documents are in the 'Crisis Collection' of the

---

[1] Available at https://play.google.com/books/reader?id=wAZ4TwuJVj4C&pg=GBS.RA2-PA398&hl=en (last visited Nov. 18, 2024).

NSA History Collection." (Id. at 9.) But the Attack report does not append or disclose the HAC Report itself.

**B.      NSA's Possession of the HAC Report**

According to NSA's Deputy Chief of Enterprise Guidance Services, Adam DeMillio, the HAC Report bears a banner stating "NOT FOR RELEASE UNLESS AND UNTIL AUTHORIZED BY COMMITTEE" twice in each volume—on the cover page and on a memorandum page that follows the cover page. (DeMillio Decl. ¶ 24.) The memoranda within each of the two volumes of the HAC Report are dated December 29, 1967 and February 15, 1968, respectively. (Id.) According to DeMillio, he has "not seen any record indicating that NSA, or anyone else, added the banner 'NOT FOR RELEASE UNLESS AND UNTIL AUTHORIZED BY COMMITTEE' after NSA received the document in 1968." (Id.) DeMillio also asserts that "the banner would have been included by the staff of the Committee on Appropriations of the U.S. House of Representatives as the preparer of the report" and "that this banner is used by Congress to indicate its intent to retain control. (Id.) And according to DeMillio, every page of the HAC Report is marked "TOP SECRET," including the memorandum page in both volumes states "This report is classified TOP SECRET because it contains information, so classified by the Department of Defense, relating to matters involving national security of the United States." (Id. ¶ 34.)

Though Defendants provide no declaration from Congress, DeMillio suggests that Congress has twice reaffirmed that the HAC Report is a congressional record not for public release. First, he recounts a 2008 FOIA request for the HAC Report that NSA denied. (DeMillio Decl. ¶ 25.) In response to that earlier request, NSA reached out to the House Appropriations Committee and "a staff member of the HAC . . . informed the Agency [by phone] that the report

1  could not be released." (DeMillio Decl. ¶ 25.) Second, in response to Kinnucan's FOIA request,

2  NSA reached out of the House Appropriations Committee to solicit its position in July 2024. (Id.

3  ¶ 26.) A HAC staff member wrote:

4  > I think the subject matter of the report would continue to fall within HAC-D jurisdiction. To my knowledge there is no change in the Committee's policy regarding this matter, but let me know if you need anything additional to that effect.

5

6  (Id.) NSA has not submitted the letter or a declaration from the staff member or anyone else from

7  Congress, and it has not identified the staff member's position or knowledge of the HAC Report.

8        After remand from the Ninth Circuit, NSA reprocessed Kinnucan's FOIA request and

9  made "discretionary releases of additional information that it determined may bear on questions

10  of congressional control and NSA's possession of the HAC Report." (DeMillio Decl. ¶¶ 19-20.)

11  NSA released two documents and some additional information about the copy of the HAC

12  Report in its possession. The two documents are a "Routing and Transmittal Slip" and a

13  "Memorandum for the director/Deputy Director" of NSA. (Id. ¶ 30.) These are internal NSA

14  records. (Id.) Although NSA believes this documents are not responsive to the FOIA request

15  because they are not the HAC Report, it disclosed them because they "potentially had bearing on

16  the decision of whether the report was a congressional record." (Id.) Second, NSA has disclosed

17  that there are handwritten notes on the cover pages of its copy of the HAC Report, which state:

18  "Not releasable" and "Information appeared in the press on 8 July '68." (Id. ¶¶ 31-32.) Although

19  there are other handwritten notes in the HAC Report, NSA believes they are not relevant to

20  Congress' intent and did not release them. (Id. ¶ 33.) Lastly, NSA confirmed that every page of

21  the HAC Report is marked Top Secret and that the memorandum page of both volumes includes

22  the following statement: "This report is classified TOP SECRET because it contains information,

23

24

1  so classified by the Department of Defense, relating to matters involving national security of the
2  United States." (Id. ¶ 34.)

3  Given their centrality to the issue before the Court, it reviews the newly-produced
4  documents in some greater detail.

5  First, the Routing and Transmittal Slip suggest the HAC Report was provided to NSA at
6  some point soon after its creation. (DeMillio Decl. Ex. A at 7 (Dkt. No. 86-1 at 7).) The Routing
7  Slip is directed to Gene Yeates, who Kinnucan concludes is Eugene Yeates, an NSA employee
8  who served int eh role of Chief for the Office of Legislative Affairs. (Pl. Mot. at 2 and n.2.)
9  There is no declaration or evidence in the record supporting this suggestion, but NSA does not
10 push back on Kinnucan's conclusion. The Routing Slip states: "Gene, you asked to review the
11 attached 2 volumes re: USS Liberty." (DeMillio Decl. Ex. A at 7 (Dkt. No. 86-1 at 7).) The
12 author's name is illegible and the Court cannot tell who sent it. Kinnucan asserts that Yeates
13 "requested and received a copy of the HAC Report from Congress," a point that, again, NSA
14 does not appear to controvert. (Pl. Mot. at 2.) Additionally, while the Court cannot decipher the
15 date of the Routing Slip, Kinnucan believes it was from 1968. This makes logical sense given the
16 Memorandum forwarding the NSA's copy of the HAC Report to the Director was dated 1968.

17 Second, the "Memorandum for the Director/Deputy Director" is dated May 13, 1968, and
18 its typed portion states:

19 > The attached is a purloined copy of the House Appropriations Committee report of the effectiveness of DoD communications triggered by the LIBERTY incident. Volume I is
20 > of interest, albeit historical, and limits itself to communications in support of LIBERTY operation. Clipped items may be of interest to you. Volume II is a treatise on DoD
21 > communications in general and contains a good summary (pp. i-xix). We recommend you read only this portion at your leisure.

1  (DeMillio Decl. Ex. A at 8.) Kinnucan maintains that the document was typed by Lieutenant

2  Commander Edward Koczak and sent to NSA Director Marshall S. Carter—two points NSA

3  does not dispute. A handwritten note on the typed Memorandum states:

4  > This is only copy. Recommend limiting reading to ADM Schulz & Col. Bolstridge (other than yourselves). I found this intensely interesting.

5  (Id.) Kinnucan believes that NSA Director Carter made the handwritten note and was referring to

6  Rear Admiral Lester Schulz, Assistant Director of NSA for the National Cryptologic Staff, and

7  Colonel Leslie Bolstridge, Chief of NSA's telecommunications organization. NSA does not

8  appear to contest these assertions.

## ANALYSIS

### A. General FOIA Standards

Congress created FOIA to allow the public to inspect the work of government agencies because "[g]overnment transparency is critical to maintaining a functional democratic polity, where the people have the information needed to check public corruption, hold government leaders accountable, and elect leaders who will carry out their preferred policies." Hamdan v. U.S. Dep't of Justice, 797 F.3d 759, 769–70 (9th Cir. 2015). FOIA allows an agency to exempt records on nine enumerated grounds that reflect the recognition that legitimate governmental and private interests could be harmed by the release of certain types of information. See 5 U.S.C. § 552(b)(1)–(9); Am. Civ. Liberties Union of N. Cal. v. U.S. Dep't of Just., 880 F.3d 473, 483 (9th Cir. 2018). The exemptions are narrowly construed, and the agency has the burden of justifying withholding under any of them. Id. The Court employs de novo review of agency compliance with FOIA. 5 U.S.C. § 552(a)(4)(B); Animal Legal Def. Fund v. U.S. Food & Drug Admin., 836 F.3d 987, 990 (9th Cir. 2016) (en banc). "The burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not agency records or

have not been improperly withheld." See United States Dep't of Justice v. Tax Analysts, 492 U.S. 136, 143 n.3 (1989) (citation and quotation omitted).

Equally important, FOIA expressly exempts congressional records from its disclosure requirements. 5 U.S.C. § 551(1)(A) (expressly excluding congress from the term "agency"); 5 U.S.C. § 552(a)(3) (requiring only agencies to disclose their "records" upon request). "[B]ecause it is undisputed that Congress is not an agency, it is also undisputed that 'congressional documents are not subject to FOIA's disclosure requirements.'" Am. C.L. Union v. C.I.A., 823 F.3d 655, 662 (D.C. Cir. 2016) (quoting United We Stand Am., Inc. v. I.R.S., 359 F.3d 595, 597 (D.C. Cir. 2004); citing 5 U.S.C. §§ 551(1), 552(f)). FOIA's exemption of congressional records avoids intruding on Congress's constitutional authority to keep certain records secret: "Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy." U.S. Const. Art. I, § 5, cl. 3; see United We Stand, 359 F.3d at 599 (noting the long-standing recognition that forcing congress to produce records would cause it to "surrender its constitutional prerogative of maintaining secrecy" (citation omitted)).

**B.      Framework to Determine "Control" of Congressional Records an Agency Possesses**

The narrow issue the Parties now present is whether congressional records in an agency's possession are "agency" records subject to FOIA disclosure or whether they remain congressional records outside of FOIA's reach. FOIA provides no insight into the question because congress "did not provide any definition of 'agency records' in the Act." Forsham v. Harris, 445 U.S. 169, 178 (1980). As such, the Court must look to judicial interpretation of the issue. Although the Supreme Court has provided some general guidance, the Court again follows

1  D.C. Circuit precedent specific to congressional records to determine whether the HAC Report is
2  a congressional record or agency record.
3      Outside of the context of congressional records held by an agency, the Supreme Court
4  has defined "agency records" to include those documents that an agency: (1) "create[s] or
5  obtain[s]," and (2) "control[s] . . . at the time the FOIA request [was] made." Tax Analysts, 492
6  U.S. at 144–45 (considering disclosure of court opinions held by the IRS); see Rojas v. Fed.
7  Aviation Admin., 941 F.3d 392, 407 (9th Cir. 2019) (applying the Tax Analysts test to determine
8  whether emails held by the FAA were "agency records"). The agency's mere possession of a
9  document does not necessarily mean it "controls" it. "By control," the Supreme Court explained
10 in Tax Analysts, "we mean that the materials have come into the agency's possession in the
11 legitimate conduct of its official duties." Id. at 145. "From this instruction [in Tax Analysts], we
12 know that not all records physically located at an agency are 'agency records.'" Judicial Watch,
13 Inc. v. U.S. Secret Serv., 726 F.3d 208, 216–17 (D.C. Cir. 2013). Considering Tax Analysts, the
14 Ninth Circuit has expressly "reject[ed] a categorical rule" and held that "the question whether an
15 agency is in 'control' of requested documents requires a more complex analysis." Rojas, 941
16 F.3d at 407.
17     Both the Parties and the Court agree that the Tax Analysts two-step framework is
18 generally applicable. The Parties and the Court also agree that because NSA possesses the HAC
19 Report, the only question is whether it "controls" the document. But the parties diverge as to
20 what framework should govern the determination of "control" of the congressional records.
21     Relying on Rojas and Tax Analysts, Kinnucan argues that the intent of the document's
22 creator is irrelevant and that an agency "controls" a record if "'the materials have come into the
23 agency's possession in the legitimate conduct of its official duties,'" or "'in connection with the
24

1  transaction of public business.'" Rojas, 941 F.3d at 408 (quoting Tax Analysts, 492 U.S. at 145).

2  Kinnucan is correct that Rojas and Tax Analysts rejected determining "control" based "'on the

3  intent of the creator' because '[s]uch a mens rea requirement is nowhere to be found in the Act.'"

4  Rojas, 941 F.3d at 408 (quoting Tax Analysts, 492 at 147). At the same time, Kinnucan concedes

5  that "the test for control is a spectrum, not a dichotomy." (Reply at 3-4.) Kinnucan then argues

6  that the Court need only examine "how the agency uses the record or any limitations on that use

7  that accompany its transfer—not the subjective intent of some congressional body who released

8  it." (Id.) The Court finds this formulation overly simplistic and not suited to determining agency

9  control of congressional records.

10       Kinnucan's proposed standard overlooks the unique constitutional considerations

11  presented by agency "control" of congressional records—an issue that neither Tax Analysts nor

12  Rojas considered. As the D.C. Circuit has noted, an application of Tax Analysts to a case

13  involving congressional records in an agency's possession "is not so simple" because "the

14  connection between Congress and the requested records implicates considerations not at issue in

15  Tax Analysts[.]" United We Stand, 359 F.3d at 599. There are two key considerations. First,

16  Congress possesses a constitutional oversight role that allows it to keep certain records secret.

17  See U.S. Const. Art. I, § 5, cl. 3 ("Each House shall keep a Journal of its Proceedings, and from

18  time to time publish the same, excepting such Parts as may in their Judgment require Secrecy.")

19  Second, congress's ability to provide oversight to agencies could well be hampered if it feared

20  that any records given to an agency as part of its oversight role could be made public by the

21  agency's mere possession of the document. See United We Stand, 359 F.3d at 599.

22       Recognizing the unique constitutional considerations at play, the D.C. Circuit created a

23  test to determine agency control of congressional records that you adopted once and should

24

1  continue to employ. (See Order on Summary Judgment at 7-8 (Dkt. No. 40) (citing Am. C.L.
2  Union v. C.I.A., 823 F.3d 655, 662-63 (D.C. Cir. 2016)).) Under the D.C. Circuit's framework,
3  "the answer to the question whether the document is an 'agency record' subject to disclosure
4  under FOIA 'turns on whether Congress manifested a clear intent to control the document.'" Am.
5  C.L. Union v. C.I.A., 823 F.3d 655, 662-63 (D.C. Cir. 2016) (quoting Judicial Watch, 726 F.3d
6  at 221). To determine congressional intent, the D.C. Circuit requires an analysis of: (1) the facts
7  and circumstances of the documents' creation and (2) the conditions attached to the documents'
8  transfer to the agency. Id. at 661–664.

9      While Kinnucan is correct that this test does not strictly hew to the Supreme Court's
10 conclusion in Tax Analysts—that the intent of the document creator is irrelevant—the Court sees
11 no clear conflict. In Tax Analysts, the Court rejected any inquiry into the document creator's
12 intent because doing so might effectively write in a new exemption into FOIA. But since
13 congressional records are expressly excluded from FOIA, an inquiry into Congress's intent when
14 merely gives meaning to and helps define the limit of this carve-out from FOIA without creating
15 a judge-made exemption. And, contrary to the Kinnucan's position, the Ninth Circuit in Rojas
16 did not expressly reject the D.C. Circuit's test's application to a case involving agency
17 possession of congressional records—it merely declined to adopt the test in the context of non-
18 congressional agency records. See Rojas, 941 F.3d at 409. Indeed, Kinnucan actually agrees that
19 the Court may examine congressional intent and that the D.C. Circuit has identified several
20 relevant factors. (Reply at 3-4.) Kinnucan concedes that "Congress may share congressional
21 oversight documents with an agency while preserving for itself the authority to control further
22 distribution." (Reply at 4 (quotation omitted).) She believes the agency can only withhold
23 production if it provides "evidence establishing that it does not control the document because it
24

1  has not or could not use it as part of its official conduct." (Reply at 3.) According to Kinnucan
2  "[i]t would be theoretically possible for Congress to release a document to an agency without the
3  agency exercising control over the document, like if the document is 'unrelated to agency
4  business,' Rojas, 941 F.3d at 409, the agency retains a copy 'for internal reference purposes
5  only,' Goland v. CIA, 607 F.2d 339, 347 (D.C. Cir. 1978), or the agency was asked to review the
6  documents as part of briefing Congress, see United We Stand, 359 F.3d at 600." (Id.)

Having again considered the issue, the Court will continue to apply the D.C. framework identified above to resolve the question of NSA's control of the HAC Report.

**C.     The HAC Report Remains a Congressional Record**

To determine control under the D.C. Circuit's test, the Court must analyze: (1) the facts and circumstances of the HAC Report's creation and (2) the conditions attending the report's transfer to NSA. As explained below, the additional evidence in the record confirms the Court's prior finding that Congress manifested a clear intent to maintain control over the HAC Report, making the HAC Report outside of FOIA's disclosure mandate.

**1.     Facts and Circumstances of the HAC Report's Creation**

The creation of the HAC Report suggests that it was intended to be kept as a secret congressional record and not made public. Staff members created two-volume report after the House Appropriations Committee held a "special hearing" on communications errors in the attack on the U.S.S. Liberty and directed the report's creation. (Attack, at 59 (Dkt. No. 86-2 at 8); see 1968 Hearing at 357-58, 393-99.) According to NSA's declarant, Congress has never publicly released the HAC Report. (DeMillio Decl. ¶¶ 25-27.) And there is no evidence before the Court that the HAC Report has ever been made public. Moreover, it appears that the Committee placed immediate restrictions on the control of the document. NSA's copy of the

1  HAC Report bears a banner stating "NOT FOR RELEASE UNLESS AND UNTIL
2  AUTHORIZED BY COMMITTEE" twice in each volume. (DeMillio Decl. ¶ 24.) To NSA's
3  current knowledge, the banner was not added by NSA or anyone else after it received the HAC
4  Report. (Id.) Additionally, it appears that Gene Yeates of NSA had to request a copy that NSA,
5  which bore the banner.

6  Additionally, the Memorandum to the NSA Director states that the HAC Report copy
7  sent to him was "purloined"—a fact that seemingly supports Defendants' position. To "purloin"
8  means "to appropriate wrongfully and often by breach of trust." Merriam Websters, Purloin,
9  available at https://www.merriam-webster.com/dictionary/purloin (last visited Nov. 18, 2024).
10 Though neither Party would concede that the HAC Report in NSA's possession was stolen, the
11 language in the Memorandum further buttresses the congressional indication of control on the
12 banner itself.

13 The evidence surrounding the HAC Report's creation finds close parallels to a D.C.
14 Circuit decision Kinnucan herself has cited approvingly where the court found a congressional
15 document in the CIA's possession was not an agency document. See Goland, 607 F.2d 339. In
16 Goland, the Court concluded that Congress intended to maintain control over a congressional
17 hearing transcript in the CIA's possession that was created during an executive session where the
18 stenographer was sworn to secrecy, the transcript was marked "Secret," and the transcript
19 contained "discussions of basic elements of intelligence methodology, both of this country and of
20 friendly foreign governments, as well as detailed discussions of the CIA's structure and
21 disposition of function." Goland, 607 F.2d at 347. Here, similarly, the HAC Report has never
22 been made public, the report was "an organizational and management study" specific to NSA,

and congress provided NSA with a copy clearly labeled as a non-public record not to be circulated. See 1968 Congr. Rep. at 359.

The facts here also contrast with those in another case where the D.C. Circuit found an absence of congressional intent to control records transferred to the CIA. See Paisley v. CIA, 712 F.2d 686 (D.C. Cir. 1983), opinion vacated in part, 724 F.2d 201 (D.C. Cir. 1984). In Paisley, the D.C. Circuit found records created by Congress and transferred to the CIA and FBI were agency records. The Court in Paisley reached that conclusion because Congress "affixed no external indicia of control or confidentiality on the faces of the documents." Id., 712 F.2d at 694. The Court found this significant because Congress had marked other related records as confidential— which the district court had properly found to be exempt as congressional records. Id. Here, the HAC Report was never made public, and the report bears a very large banner indicating that Congress wished the document to be kept from the public. Both Goland and Paisley confirm the Court's determination that the HAC Report is a congressional record.

Kinnucan also fails to convince the Court there are any indications that Congress did not intend for the HAC Report to remain a congressional record when it transferred it to NSA. First, Kinnucan argues that the only evidence of Congress' intent to control the HAC Report is the "Top Secret" marking on it. (Pl. Mot. at 12.) But this argument fully ignores the banner on each page of the HAC Report stating, "NOT FOR RELEASE UNLESS AND UNTIL AUTHORIZED BY COMMITTEE". Second, Kinnucan argues that the facts here do not align with those in Goland, in part because there is no evidence that NSA was given the HAC Report as a trustee or that the report was limited to Congress' oversight of NSA. But this argument seemingly ignores the banner language and the fact that the report itself was never made public even if it was identified in public hearings. And the HAC Report itself was created as part of the House's

oversight of the NSA. Third, Kinnucan suggests that the routing slip did not require return of the report, which indicates Congress intended to relinquish it. While the Court finds some merit in this argument, it is not dispositive. The routing slip attached the copy of the HAC Report that was clearly marked with the banner and it was not for distribution. There is nothing in the routing slip suggesting that Congress intended NSA to use the reports broadly or in some manner contrary to the banner. The Court rejects Kinnucan's arguments and continues to find the HAC Report a congressional record.

### 2. Conditions attending the report's transfer to NSA

NSA has again shown that Congress imposed restrictions on NSA's use of the HAC Report. The Report bears the banner stating "NOT FOR RELEASE UNLESS AND UNTIL AUTHORIZED BY COMMITTEE," and NSA has no record of the Report without that marking. (Declaration of Sara Stevens ¶ 11 (Dkt. No. 37).) Additionally, the May 13, 1968 NSA Director's Memorandum that forwarded the copy of the HAC Report states that it was "a purloined copy" of the report. (Dkt. No. 86-1 at 5.) While the Parties do not believe NSA stole the copy, this language could suggest the copy sent to Director Carter from Koczak was taken from Yeates without Yeates' permission. The mere fact that NSA's internal use of the Report references the word "purloin" stands at odds with any suggestion that Congress told anyone at NSA that it could use the document freely. Indeed Director Carter "recommend[ed] limiting reading" to just two high-ranking individuals at the time. (Dkt. No. 86-1 at 8.) These facts suggest that NSA's possession of the HAC Report is not the product of Congress's desire for NSA to use the document freely. And NSA itself has not disseminated the Report and has consistently refused to produce it in response to FOIA requests. (See DeMillio Decl. ¶¶ 25-26.)

|   | Kinnucan argues that NSA has unfettered use of the HAC Report because NSA has retained a copy of the HAC Report in its "History Collection" and because it neither returned the copy nor "limited the dissemination and use to the original requestor." (Pl. Mot. at 13.) While these arguments have some facial appeal, they are not convincing. First, there is no evidence before the Court us to how NSA maintains the HAC Report and the extent to which it is accessible within the agency. There is nothing before the Court suggesting that it is widely accessible. At most, the record shows that five individuals viewed it in 1968 and the two individuals who prepared the <u>Attack</u> report reviewed it several years later. That does not support a finding that NSA considers the record open to any use. Second, while it may seem peculiar that NSA never returned a copy, there is no indication that NSA ever acted in a way contrary to the Congressional banner restricting its public dissemination. Indeed, the Routing Slip itself did not demand return of the document, so NSA cannot be accused of ignoring a return request from Congress. And while the lack of a demand from Congress could also mean the NSA was free to use the Report broadly, the Court cannot reach that conclusion given the fact that the forwarded copy of the Report was festooned with a banner proclaiming Congress' continued ownership. And NSA's Director stated that the Report should have limited readership to just two others. So while the HAC Report did circulate beyond the initial requester, the distribution appears to have been limited to only four other individuals.

The Court separately notes that it places no weight on the fact that two unidentified congressional staff members have told NSA that it does not believe the Report should be released. (<u>See</u> DeMillio Decl. ¶¶ 25-27.) These statements are pure hearsay and do not constitute admissible evidence. If NSA believed the present view of Congress was relevant, it should have sought declarations from those with knowledge and authority to speak on this issue. The

1  approach NSA has taken is wholly unconvincing and utterly inadequate to make even the point
2  NSA wishes. And the present view of Congress is not relevant.

## CONCLUSION

The Court has considered the new evidence presented on the question of NSA's control of the HAC Report, and it continues to find it to be a congressional record not subject to FOIA. On that basis, the Court GRANTS NSA's Motion and DENIES Plaintiff's Motion.

The clerk is ordered to provide copies of this order to all counsel.

Dated November 21, 2024.

Marsha J. Pechman
United States Senior District Judge